

*U.S. Department of Justice*

*United States Attorney*
*Eastern District of New York*

EAG:NMA
F.#2008R01567

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 10, 2011

**By ECF**

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

      Re: United States v. Anthony Sclafani, et al.
           Criminal Docket No. 09-672 (NGG) (S-1)

Dear Judge Garaufis:

      The defendants Anthony Sclafani and Joseph Loiacono are scheduled to be sentenced by the Court on Thursday, April 14, 2011. The government respectfully submits this letter in response to the defendants' letter application dated December 13, 2010, which requested a downward departure based upon the alleged disparities between the plea offered to the defendants and those offered to other co-defendants. For the reasons set forth below, the government respectfully submits that Court should sentence the defendants to ranges of imprisonment above the applicable Guidelines range and impose restitution in the amount of $117,000.

I.   Background

      The defendants are longtime inducted members of the Bonanno organized crime family ("Bonanno family") of La Cosa Nostra, a violent criminal organization. The defendants' positions are corroborated by consensual recordings, the testimony of other cooperating witnesses and surveillance evidence. For example, during a July 4, 2008 consensually recorded meeting, Loiacono stated the following:

           You know they're Bonannos if they say, 'Hey, Bo. Hey, Bo.' Get the fuck outta here. I gave it up. Ya know

>      who used to do that all the time?  Joey Massina (a
>      reference to Bonanno family Boss Joseph Massino).  Joey
>      Massina.  Do I want to do what he used to do?  No way.
>      'Cause every time I was in his company, 'Bo . . . hey
>      bo.'

Additionally, during a November 4, 2008 consensually recorded meeting, Sclafani advised CW that he was newly promoted to the position of captain in the Bonanno family, explaining, "I took it because they need me."  Sclafani went on, stating, "This is the family, our family (a reference to the Bonanno family)." During that same meeting, Sclafani told CW about a conversation he had with "Louie Electric" (a reference to Bonanno family captain Louis Decicco).  Sclafani told CW that Louie Electric had once asked Sclafani if Sclafani knew what "the life" was made of.  Noting sarcastically that he had been in the life for only about twenty-five to thirty years, Sclafani told CW that Louie Electric said the life was all about the money.  Sclafani disagreed, telling CW that the life was not all about the money to him.  In addition to these consensual recordings, which capture the defendants describing their position in the Bonanno family, Special Agents of the Federal Bureau of Investigation ("FBI") performed surveillance of the defendants meeting together and with other members and associates of organized crime on multiple occasions.

   Over the past several years, an extensive federal investigation, which involved visual surveillance and consensual recordings as set forth above, revealed that the Loaicono and Sclafani profited from an extensive loansharking operation, including by collecting money through the use of extortionate means from CW and another individual.  In 2007, CW fell over $30,000 behind in his interest payments to Sclafani, Loiacono and others, and Sclafani and Loiacono's threats on CW's life began to escalate.  At the time, CW feared that he would be killed if he did not continue to make payments, which he did not have the money to do.  CW contacted the FBI and began cooperating with the government, agreeing to: (1) be debriefed about his knowledge of criminal activity, including his own criminal conduct;
(2) testify about these criminal activities, if necessary; and
(3) make consensual recordings.  Over the next two years, CW recorded Loiacono, Sclafani and others discussing various criminal activities, including crimes of violence.  As a result of this conduct, on October 7, 2009, the defendants were arrested and charged in an indictment with racketeering and racketeering conspiracy, including predicate acts of loansharking and loansharking conspiracy, as well as substantive counts of loansharking and loansharking conspiracy.  On November 17, 2010,

both Loiacono and Sclafani pled guilty to Count One of the superseding indictment, which charged the defendants with racketeering, including Racketeering Act One C (extortionate extension of credit conspiracy) and Racketeering Act Five A (extortion conspiracy).

II. The Defendants Have Materially Breached Their Plea Agreements With the Government

   A.   The Plea Agreements

Both defendants pled guilty pursuant to plea agreements with the government. According to Sclafani's plea agreement with the government, Sclafani stipulated to the following Guidelines calculation: an adjusted offense level of 24 and a criminal history category of I, resulting in an advisory Guidelines range of imprisonment of 51 to 63 months. (See Sclafani's Plea Agreement at ¶ 2, attached at Exh. 1). This calculation included a four-point aggravating role adjustment based upon the defendant's role in the offense. (Id.) According to Loiacono's plea agreement with the government, Loiacono stipulated to the following Guidelines calculation: an adjusted offense level of 23 and a criminal history category of I, resulting in an advisory Guidelines range of imprisonment of 46 to 57 months. (See Loaicono's Plea Agreement at ¶ 2, attached at Exh. 2). This calculation included a three-point aggravating role adjustment based upon the defendant's role in the offense. (Id.) These pleas were the result of protracted negotiations with the government, including multiple meetings with members of the prosecution team.

Perhaps the most significant part of these defendants' agreements with the government was the requirement that each defendant pay $80,000 in forfeiture within ninety days of their guilty pleas. (See Exhs. 1 and 2 at ¶¶ 6, 7). This provision was integral to the plea agreement given the amount of money paid to these defendants over the course of their criminal conduct by CW and was the subject of plea negotiations between the government and both defendants. In paragraph 7 of their plea agreements, each defendant agreed to the following provision:

> Payment of the Forfeiture Money Judgment shall be made by certified or bank check, payable to the United States Marshal Service within ninety (90) days of the date the defendant enters his plea of guilty pursuant to his agreement.

3

Paragraph 9 of each agreement states, in relevant part:

> The failure of the defendant to forfeit any monies and/or properties as required under this agreement, including the failure of the defendant to execute any document to accomplish same on timely notice to do so, shall constitute a material breach of this agreement.

To date, neither of the defendants has made any payments towards the $80,000 due in forfeiture.

### B. Legal Standard

It is well established that plea agreements are to be interpreted according to contract law principles, such that a defendant who knowingly and voluntarily entered into a plea agreement is considered bound by its express terms. United States v. Cimino, 381 F.3d 124, 128-29 (2d Cir. 2004); United States v. Difeaux, 163 F.3d 725, 728 (2nd Cir. 1998). In United States v. Merritt, the Second Circuit held that a defendant "who materially breaches a plea agreement may not claim its benefits." 988 F.2d 1298, 1313-14 (2d Cir. 1993). In determining whether or not the defendant has breached his agreement with the government, courts apply a preponderance of the evidence standard. See Byrd v. United States, 413 F.3d 249, 251 (2d Cir. 2005). In Merritt, the court affirmed the district court's sentence, finding that the government did not breach its agreement with the defendant by advocating for an upward departure because, inter alia, the defendant himself had first breached the agreement by failing to provide financial information required by his agreement. 988 F.2d at 1313-14; see also Cimino, (after the defendant breached his agreement with the government by advocating for a downward departure, the government was no longer bound by the agreement and properly advocated for an upward departure).

### C. Analysis

Here, there is no question that both defendants have materially breached their agreements by failing to pay the agreed-upon $80,000 in forfeiture "within ninety (90) days of the date the defendant enters his plea of guilty pursuant to this agreement." (See Exhs. 1 and 2, at ¶ 7). The defendants pled guilty on November 17, 2010. According to the plain terms of the agreement, the defendants were required to pay the $80,000 on or before February 15, 2011. There is no dispute that the defendants have not made the payment that they agreed to as an

express term of their plea agreement with the government, and are thus in material breach of their agreement.  Accordingly, the government respectfully submits that given the egregious nature of the defendants' conduct, including in particular Sclafani's post-arrest participation in illegal conduct set forth below, the Court should sentence the defendants to a significant custodial sentence above the applicable Guidelines range.

III. Pursuant to the Section 3553(a) Factors, the Court Should Sentence the Defendants to a Significant Term of Incarceration Above the Applicable Guidelines Range

    A.    Legal Standard

It is now settled law, pursuant to the United States Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005), that the Guidelines are advisory, not mandatory, id. at 764-65, and that a sentencing court has the authority to fashion a reasonable and appropriate sentence in a given case. However, the Supreme Court further held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence.  Id.

In Gall v. United States, 128 S. Ct. 586 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall, 128 S. Ct. at 596 (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented."  Id. at 596-97 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) sets forth factors to be considered by the Court in imposing a sentence, including, inter alia, the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed vocational or educational training.

B.   Nature and Circumstances of the Offense

1.   Racketeering Act One

Racketeering Act One charges Bonanno family captain Anthony Sclafani and Bonanno family acting captain Joseph Loiacono for their participation in the conspiracy to collect from CW an extension of credit through the use of extortionate means. As set forth in the pre-sentence investigation report ("PSR"), between 2004 and 2008, Sclafani and Loiacono lent money to CW at exorbitant rates of interest, and also procured loanshark loans for CW from other individuals. (PSR ¶¶ 17, 19). At one point, CW was responsible for paying Sclafani and Loiacono a weekly interest payment of over $1,000. (PSR ¶ 20). CW has advised that between 2004 and 2008, Loiacono, Sclafani and others lent CW approximately $42,500, and as of 2007, CW fell behind and owed over $30,000 in interest alone. (Id.) When CW failed to make the weekly $1,000 interest payments, Sclafani and Loiacono began threatening CW with physical harm. (PSR ¶ 21). When CW sought relief from other members of the Bonanno family leadership, Sclafani told CW that there would be no relief, stating during a consensually recorded meeting:

> I'm gonna tell you right now. I'm gonna tell you what I told Anthony (a reference to Bonanno family acting captain Anthony Pipitone). Make sure . . . every week you take care of this, or every two weeks, whatever you got to make it. Listen to me, no bullshit this time. Look at me. I don't give a fuck who comes to me, we're gonna have a fucking problem here, you understand? I don't give a fuck about nobody, that's the way I am. You're my friend, don't fuck around with me, do the right thing.

(Id.)

On two separate occasions, Sclafani went to CW's residence in the early hours of the morning to warn him to stay in contact with Sclafani about his loanshark debt. Sclafani repeatedly warned CW that he could be either hurt or killed for his failure to pay Sclafani, Loiacono and others. (PSR ¶ 22). Among other threats, Sclafani told CW that he would be lucky if Loiacono and Sclafani didn't chop him up and leave him in the woods behind Sclafani's house. During an October 5, 2007 consensually recorded meeting, Sclafani told CW, "you have to make the puzzle fit, you can't stay like this, you'll wind up getting hurt, someone will sneak ya" and "if it gets to the wrong person, they'll say, whack this motherfucker."

## 2. Racketeering Act Five

Racketeering Act Five charges Loiacono and Sclafani with conspiring to extort John Doe, an onsite general contractor responsible for a construction project in Newark, New Jersey (hereinafter the "Newark Project"). (PSR ¶ 25). Based upon John Doe's work on the Newark Project, co-defendant Peter Defilippo offered to procure additional work for John Doe if John Doe would agree to "kickback" to Peter Defilippo ten percent of the value of the job. (Id.). John Doe then bid and won another job worth approximately $110,000, and because the job was tangentially associated with others responsible for the Newark Project, Defilippo felt that John Doe owed Defilippo the ten percent kickback. (Id.) Although John Doe paid Defilippo $2,000, Defilippo complained to Sclafani and Loiacono that he was owed more money. (Id.) In approximately 2008, Loiacono and Sclafani contacted CW and asked him to find John Doe and to provide John Doe's name and address to Loiacono and Sclafani so they could collect additional money from him. (Id.) On multiple occasions, Loiacono and Sclafani told CW that they intended to hurt John Doe if he did not pay the money. (Id.)

During a June 20, 2008 consensually recorded meeting, Loiacono told CW:

> We don't want anything on what he's doing now (referring to John Doe's current construction project). We got him in there though (referring to the Newark Project). Tell him, 'don't be a jerkoff cocksucker.' Cause, seriously, if you know where this kid lives, we're gonna hurt him then. We are gonna hurt him. He'll get hurt. He'll get hurt. Tell him. I think Pete (a reference to Defilippo) knows the address. We'll get him. We'll get this kid.

Thereafter, during a July 18, 2008 consensually recorded meeting, Loiacono advised CW, "We'll get this kid. I think we know where he lives. Give it a little time. I seriously mean it. Don't worry about it. But we will get him." During an August 22, 2008 consensually recorded meeting, Sclafani asked about John Doe, stating, "Who the fuck is this cocksucker? Where'd you find him? Where is he from, this kid? He owes me $10,000." During that same meeting, Sclafani told CW that if he ran into John Doe, he should tell him, "What do you think you're cute? You're fooling with the wrong people, you jerkoff. It goes around. If they ever run into you . . . you understand?" During a September 25, 2008 consensually recorded meeting, Loiacono advised CW that he had obtained John Doe's address and that he intended to go there

early in the morning, stating, "I just want him to know somebody was there, at the house.  That makes these guys usually fucking get a little crazy."[1]

        3.    Analysis

Given the serious nature of the underlying offense and the defendants' roles in the offense, the history and characteristics of the offense weigh in favor of significant custodial sentences above the advisory Guidelines range for the purposes of punishment and promoting general and specific deterrence.  See 18 U.S.C. § 3553(a)(1), (a)(2)(A) & (a)(2)(B).  The defendants argue that the Court should find that the defendants had no intention of instilling fear or harming CW or his family based upon the fact that CW never suffered physical injury.  This argument ignores the fact that when the CW began cooperating with the government in October 2007, the FBI began giving CW money to make his loanshark payments to Sclafani and Loiacono, obviating the need for such violence.  With regard to the conspiracy to extort John Doe, on November 17, 2008, FBI Special Agents executed a search warrant on Loiacono's person and recovered directions to the purported address of John Doe.  This search was conducted, in part, to deter the defendants from finding and assaulting John Doe.

    C.    History and Characteristics of the Defendants

        1.    Defendants' Arguments

First, the defendants argue that the Court should downwardly depart and sentence the defendants to a below-Guidelines sentence based upon the plea offers made to their co-defendants Joseph Sammartino and Vito Pipitone.  This argument is without merit.

First, the government has consistently described Sammartino as less culpable than Sclafani and Loiacono, despite Sammartino's higher rank in the Bonanno family.  Notably, Sammartino was not charged in either the racketeering or racketeering conspiracy counts of the indictment.  While Sammartino was Loaicono and Sclafani's captain at certain periods relevant to the charged conduct, the government clearly alleged that Sammartino was initially unaware of CW's loan, and that only

---

[1] On November 17, 2008, FBI Special Agents executed a search warrant on Loiacono's person and recovered directions to the purported address of John Doe referenced in this recording.

8

when Sammartino later learned of the loan, Sammartino demanded his share of the proceeds. See Govt's October 7, 2009 Detention Letter (Docket No. 3). It was Sclafani and Loiacono's decision - not Sammartino's - to extend the loan to CW, to collect the "juice payments," and when CW was unable to pay the juice, to continue to lend CW money to cover the juice and thereby compound CW's debt. It was Loiacono and Sclafani who intimidated CW repeatedly and who threatened to kill CW. Proving how absurd the comparison made by the defendants, Sclafani concedes that during a May 9, 2008 consensually recorded meeting between Sclafani, Loiacono and CW, Sclafani and Loiacono themselves threatened CW, invoking Sammartino to scare CW into paying his loanshark debt, stating, "[Sammartino] said do whatever you gotta to do to get your money back." Directly prior to that, the consensual recording indicates that Sclafani stated, "I don't want to hurt you, I like you. You're my friend. But you can't hurt [Loiacono] and bury me either. And I went to my guy and he said, 'I don't give a fuck.' He said, did I tell ya? 'Listen, I want that fucking money every month.'" Because Sammartino played an entirely disparate role in the charged conduct and indeed, was not even charged with racketeering or racketeering conspiracy, the defendants' argument must fail.

Additionally, defendant Vito Pipitone was charged for entirely separate conduct, both temporally and factually, such that his plea relied on Guidelines entirely separate than those applied in the case. Additionally, the fact that Pipitone received a mitigating role adjustment for his minor role in a stabbing attack has literally no bearing on whether such an adjustment was appropriate for Sclafani or Loiacono in a completely different scenario where each, in fact, carried out a leadership role.

As for the defendants' argument that the government somehow misrepresented the facts to the Court during its detention proceedings, even the defendants' draft transcript does not reduce Sclafani's statements to mere puffing; in fact, they reveal the threats for what they are - real and dangerous. Sclafani concedes that he told CW during a November 4, 2008 consensually recorded meeting, "If I tell you I'm gonna kill ya, I'm gonna kill ya . . . But if I tell you, 'you've got a fuckin problem, I'm gonna kill you cocksucker,' you're gonna die." The defendants add that Sclafani stated, "Me and you are going to die. Something is going to happen. But I don't want to do that." On multiple occasions prior to this recording, Sclafani threatened to kill CW for failure to pay back his outstanding loanshark debt. Sclafani was explaining his philosophy as a member of organized crime, but in making the statement to CW,

Sclafani clearly meant to communicate to CW that Sclafani was someone to be taken at his word and that if he made a threat, he meant it.[2]

None of the facts set forth in the defendants' sentencing memorandum dispute the defendants' participation in criminal acts on behalf of the Bonanno family, their ascension into its ranks or the lucrative nature of their involvement. CW paid over $100,000 to Sclafani and Loiacono over the course of his relationship with them. Based on the history and characteristics of the defendants, the defendants should be sentenced to a significant period of incarceration above the applicable Guidelines range, as well restitution in the amount of $117,000, the approximate amount paid by the CW to these defendants and their cohorts over the years.

2.  Sclafani's Post-Arrest Conduct

Additionally, a review of Sclafani's prison recordings indicates that Sclafani has continued to profit from his illegal gambling activities since his arrest. CW advised that Sclafani ran an illegal gambling operation in Staten Island, New York, along with his partner James Rossi. In fact, on the day Sclafani was arrested, FBI Special Agents observed Sclafani returning to his home in the early morning hours with Rossi. Sclafani later acknowledged to the FBI, in sum and substance, that he had won money playing poker the night before his arrest and then his friend Jimmy Rossi picked him up and they went for coffee. (See Government Discovery Letter dated November 17, 2009, attached at Exh. 3). Sclafani further acknowledged that Rossi had "a problem" with the state and thought a detective was following

---

[2] The defendants falsely accuse the government of misrepresentations and gamesmanship in various parts of their submission. These accusations are baseless. For example, the defendants claim that "[s]everal months [after the bail appeal], the defense was provided copies of the tape recordings as part of the government's discovery obligation." Sclafani's appeal from the permanent order of detention entered by United States Magistrate Judge Marilyn D. Go was heard by the Court on October 22, 2009. (Docket No. 104). On October 28, 2009, six days after the Sclafani's hearing less than three weeks after the defendants' arrest, the government produced over one hundred consensual recordings, including the recordings at issue here, to the defendants. (Docket No. 111). The defendants' other arguments are similarly baseless and irrelevant.

10

him.  (Id.; see also Queens District Attorney Press Release dated August 6, 2009, attached at Exh. 4).

       According to the defendant's recorded prison calls, even after his arrest, Rossi continued to stop by Sclafani's girlfriend Linda Dubois' residence to drop off money for Sclafani's defense and to support Dubois.  For example, on December 2, 2009, Dubois told Sclafani in a recorded telephone call, "That idiot showed up here last night- Jimmy."  She continued, "'You know the club is fucked up,' he's telling me that the club is closed and then in the next breath, he's saying, 'Oh now, I just got a call we can't open the club until 11 o'clock,' he's crazy."[3]  Later in the call, Dubois told Sclafani that Rossi told her "he's not doin' nothin' with the sports, the football."  In response to Sclafani's inquiry as to whether Rossi left "anything" for Dubois, Dubois told Rossi that he did.  Sclafani further advised Dubois that Rossi would give her something every few weeks because "it's coming to [her]" telling her "you're a part of me."

       After a number of recorded phone calls discussing the need for Rossi to contact Sclafani's son and his lawyer in order to contribute toward Sclafani's legal defense, on December 30, 2009, Dubois told Sclafani in a recorded telephone call about Rossi, "He's mad because they asked him for money," continuing "last time, he came here he was all bent out of shape.  He was like, 'I wanna know what the family's giving' . . . . 'He wants 25 thousand from me, what'd the family put up?'"  Clearly, Sclafani was continuing to use his illegal relationship with Rossi to support his girlfriend and to pay for his legal defense, which demonstrates his lack of respect for this Court and for the law.

    D.   <u>The Need for the Sentence Imposed</u>

       Given the defendants' position in the Bonanno family, the nature of the extortion conspiracy and the threats endured by CW, as well as their level of involvement in the extortion conspiracy, a significant sentence of incarceration is appropriate.  In fact, a lesser sentence would promote disrespect for the law.  <u>See, e.g.</u>, <u>United States v. Cutler</u>, 520 F.3d 136, 154 (2d Cir. 2008) (concluding that the district court made errors in certain "Guidelines applications and in its departure

---

[3] Later in the call, Sclafani and Dubois discuss Rossi's state case.  Additionally, Sclafani advised Dubois that he used to spend five to six nights per week with Rossi.

11

decisions; that the sentences imposed did not properly interpret certain of the sentencing factors that the court was required to consider under 18 U.S.C. § 3553(a), such as just 'punishment' and deterrence of others; and that some of the court's rationales would promote disrespect for the law").

Given the record in this case, these defendants should be sentenced as an example to others involved in the mafia, to send a message that extortion is a crime of violence that will be taken seriously by the government and by the Court. These defendants have ruined at least one man's life. By extorting CW over such a protracted period, they effectively destroyed CW's thriving plumbing business, irreparably damaged CW's credit, and drove him to cooperate with the government, which resulted in CW's inability to reside near his friends and family. Their blatant criminal behavior took everything from CW. And now, in the last salvo in the defendants' barrage on CW, the defendants refuse to honor their agreement with the government and pay the agreed-upon forfeiture, robbing CW one last time. There can be no mistake - these defendants ruthlessly and repeatedly robbed CW, a working man, over the last six years; they robbed CW so that they could put food on the tables of their families and roofs over their heads, and most of all, so that they did not need to work and had time to "play mafia." Here, a significant custodial sentence is needed in order to punish these defendants for what they have done, but also to deter these defendants, who apparently have not been deterred to date, from engaging in and profiting from illegal criminal activities in the future.

IV. <u>Conclusion</u>

    Accordingly, as set forth above, given the defendants' willful disregard for their agreement in this case and Sclafani's post-incarceration behavior, in particular, the defendants should be sentenced to a significant custodial sentence in excess of their advisory Guidelines ranges.

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney

                    By:    /s/
                              Nicole M. Argentieri
                              Stephen E. Frank
                              Gina M. Parlovecchio
                              Assistant United States Attorneys

cc:   Michael Washor, Esq. *(by ECF)*
      Robert Leighton
      Senior Probation Officer Patricia Sullivan *(by Mail)*